IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 10, 2023

**STATE OF TENNESSEE v. WEBSTER MALONE**

**Appeal from the Circuit Court for Rutherford County**
No. F-82251        James Turner, Judge

_____

**No. M2023-00058-CCA-R3-CD**

_____

A Rutherford County jury convicted the Defendant, Webster Malone, of two counts of selling less than .5 grams of cocaine. The trial court denied his request for community corrections and sentenced him to an effective sentence of fifteen years of incarceration. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions and that the trial court erred when it sentenced him. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Taylor D. Payne, Murfreesboro, Tennessee, for the appellant, Webster Malone.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew Westmoreland and William Dement, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from the Defendant selling cocaine to a confidential informant employed by the Narcotics Unit with the Special Investigations Division of the Murfreesboro Police Department. For these sales, a Rutherford County grand jury indicted the Defendant for four counts of selling less than .5 grams of cocaine while in a drug-free school zone.

The Defendant was tried on two counts of the four, and the record evinces that he was not tried on charges that the sale occurred in a drug-free school zone. The parties presented the following evidence at trial: Detective Nick Sapp testified that he was a long-term narcotics investigator and that, as such, he attempted to get a confidential informant ("CI") to help him purchase narcotics. In this case, a patrol officer contacted him and said that he knew of someone who wanted to act as a paid CI. The CI said that he normally purchased crack cocaine and gave the detective the names of several of his dealers. The CI said he could purchase crack cocaine from the Defendant, whom he referred to as "Duck."

The detective set up a meeting time and location with the CI on January 2, 2019. They met at a predesignated location at 1:00 p.m., went over the equipment, searched the CI and his vehicle to ensure there was no contraband, and issued him $60 to purchase crack cocaine. The CI left the meeting location at 1:23 p.m., and traveled to an apartment where the purchase was planned to occur. He arrived at 1:31 p.m., and made the purchase at 1:35 p.m. The CI drove back to the meeting location and arrived at 1:43 p.m. The informant gave the detective what appeared to be crack cocaine on aluminum foil. The substance field tested positive for cocaine. Detective Sapp wrapped the substance and sent it to the Tennessee Bureau of Investigation ("TBI") for testing.

The detective played a recording of the transaction. It showed the CI hand the Defendant money. Detective Sapp also took screen shots of some of the portions of the video, which the State showed the jury as photographs. The Defendant can be seen in one of the photographs as well as his apartment number, #15. The video also showed the Defendant hand the CI what appeared to be a piece of aluminum foil, which was how the cocaine the CI subsequently gave to the detective was packaged.

The CI contacted Detective Sapp on January 3, 2019, again asking to purchase drugs from the Defendant. They arranged to meet on January 4, and to go through the same procedure. The informant left the meeting location at 1:10 p.m. and traveled to the Defendant's apartment. The Defendant was not at home, and the informant was taking longer than usual. The Defendant arrived at 1:37 p.m., and the two made the exchange. The informant gave the Defendant $60, and he returned to the detective with a white substance wrapped in aluminum foil. Detective Sapp gathered the substance, weighed it, and packed it to be sent to the TBI for testing.

A thirty-six minute video recording of the drug purchase was played for the jury. It showed the Defendant handing the CI what appeared to be aluminum foil. The detective again took screen shots of the video, which showed the Defendant and his apartment number. Detective Sapp identified the Defendant in court.

2

During cross-examination, Detective Sapp testified that the informant was paid $180 for each successful drug purchase. Detective Sapp said that he did not know where the CI was at the time of trial. The two had not spoken in two years, and the CI's phone number had been changed. The detective believed that the CI may have moved to Michigan.

Jeffrey Keaton, a captain[1] with the Murfreesboro Police Department, Criminal Investigation Division, testified in conformity with Detective Sapp about the two drug purchases. He confirmed the processes used during the purchase. He added that he was familiar with the Defendant from a previous traffic stop. He recalled that the Defendant drove a very distinctive vehicle, a Ford Taurus with large whitewall tires.

Captain Keaton testified that, during the drug purchases, he parked his vehicle in a location that allowed him to clearly see the Defendant's apartment. He was watching the apartment on January 2, 2019, when the CI arrived. He saw the Defendant exit apartment number 15, walk out onto the balcony, and look around. The Defendant returned into the apartment, leaving his door open, within a minute or two of the CI stepping onto the breezeway outside the Defendant's apartment. Captain Keaton said he saw the Defendant standing at the edge of his door and have a brief conversation with the CI during which the CI handed the Defendant money and the Defendant handed the CI a package of aluminum foil. Then, he saw the CI leave and the Defendant go back into his apartment.

On January 4, 2019, the captain was detained by a meeting, but was aware of the drug sale, so he headed to the location of the sale after the meeting. En route, he activated his listening device so he could hear what was happening with the CI. When he was almost to the Defendant's apartment, the Defendant pulled in front of his unmarked vehicle. As the Defendant turned into his apartment complex, Captain Keaton pulled into an adjacent complex, so he could see the Defendant's front door from his vehicle.

After he got set up, the captain saw the CI sitting in a chair outside of apartment number 15. He saw the Defendant come up from the stairs and approach the CI. The CI stood and handed the Defendant $60, saying over the audio recording "that's sixty." The Defendant took the money and went into his apartment. He then returned and handed the CI what appeared to be an aluminum foil package. The captain identified the Defendant in court.

During cross-examination, Captain Keaton testified that he did not take any photographs during the drug purchases. He confirmed the CI was paid $180 per drug purchase and that he helped them purchase drugs from between five and ten dealers.

---

[1]Captain Keaton was a lieutenant at the time of these events.

3

Ella Carpenter, who worked as a Special Agent with the TBI at the time of this investigation, testified that the substance submitted for analysis from the January 2, 2019 purchase was .37 grams of cocaine base. The substance submitted from the January 4, 2019 purchase was .34 grams of cocaine base.

The Defendant moved for a judgment of acquittal, arguing that in the absence of the CI testifying the State could not meet its burden of proof. The trial court denied the motion.

The Defendant testified, in narrative fashion, and said that he never saw the CI. He said that he never sold the CI anything and never received any money from the CI. The Defendant testified that the CI should be present at trial to say that the Defendant sold him something, but the CI was not present. He alleged that the police officers were lying because there was no informant. The Defendant contended that the video did not show the informant but only the Defendant so there was no informant.

The Defendant said he had children and grandchildren and had been married almost thirty-one years. He said his wife knew that no CI came to their house.

During cross-examination, the Defendant agreed that he lived at the apartment shown in the video in January 2019. He stated that he would have known if he sold drugs to someone, and he did not. He said that, despite the video, he was unsure whether he handed an aluminum foil package to anyone. He agreed that the video showed him handing something off, but he did not know what it was that he handed off. He reiterated that he never saw a CI. The Defendant said he had no reason to not tell the truth but that someone else was lying.

Based upon this evidence, the jury convicted the Defendant of two counts of the sale of less than .5 grams of cocaine, a Schedule II controlled substance. After a sentencing hearing, summarized below, the trial court denied the Defendant's request for Community Corrections and sentenced him to fifteen years of incarceration.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it sentenced him.

## A. Sufficiency of Evidence

On appeal, the Defendant contends that the evidence is insufficient to support his convictions for sale and delivery of cocaine because the CI did not testify. Further, he asserts that, while he was depicted in the videos, the CI could not be seen, making his

verdict contrary to the evidence. The State responds that neither of these considerations invalidates the jury's verdict and that the jury could reasonably conclude beyond a reasonable doubt that the Defendant was guilty of both counts of the sale of .5 grams or less of cocaine. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted). This standard is identical whether the conviction is predicated on direct or circumstantial evidence. *State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977). In the absence of direct evidence, a criminal offense may be established entirely by circumstantial evidence. *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010) (citing *Duchac*, 505 S.W.2d at 241; *Marable*, 313 S.W.2d at 456-58).

Tennessee Code Annotated sections 39-17-417(a)(2) & (3) provide that it is an offense for a defendant to knowingly deliver and sell a controlled substance. Cocaine is a controlled substance. T.C.A. § 39-17-408(b)(4) & § 39-17-415(a)(1) (2018). It is a Class C felony to commit any of these acts when the amount of the cocaine is less than .5 grams. T.C.A. § 39-17-417(c)(2)(A).

We squarely addressed the issue of whether the State must present a confidential informant to sufficiently establish its case in *State v. Bobby Lewis Smith*, No. M2010-02077-CCA-R3-CD, 2012 WL 3776679, at *3 (Tenn. Crim. App. Aug. 31, 2012), *perm. app. denied* (Tenn. Mar. 21, 2013). When addressing the same argument by Mr. Smith, we stated:

> We know of no law which requires the State to present the testimony of a confidential informant in order to establish its case. The State maintains authority and discretion over what evidence it wishes to present to the jury. Although the confidential informant might have been a stronger witness to establish the case, the State in this case chose to present other evidence. That evidence was placed before the jury, who is responsible for weighing said evidence in reaching a determination of whether the State had met its burden of proof. In this case, the jury felt that the State had indeed carried the burden that the defendant delivered a controlled substance.

*Id.* at *3. In accordance with our holding in *Smith*, we conclude that the State can establish the elements of the sale of less than .5 grams of cocaine without presenting the testimony

of the confidential informant.[2]  We now turn to address whether the evidence the State did present supported the Defendant's convictions.

The evidence presented at trial, viewed in the light most favorable to the State, was that law enforcement provided the CI with prerecorded funds to arrange for the purchase of drugs from the Defendant.  Law enforcement testified that the CI's person and vehicle had been thoroughly searched for contraband prior to the transaction.  The CI was outfitted with audio and video recording equipment.  He left the assigned meeting location, gave turn by turn directions, and then arrived at the Defendant's apartment.  Captain Keaton saw the CI arrive for the first purchase and saw him waiting outside the apartment before the second purchase.  The CI then handed the Defendant the $60 on both occasions, and, on both occasions as seen in the videos, the Defendant handed the CI an aluminum foil package.  The CI then, again giving turn by turn directions, arrived back at the meeting place where he gave officers the aluminum package and was again searched.  TBI testing proved that the aluminum foil packages contained .37 and .34 grams of cocaine base, respectively.  This is sufficient evidence from which a rational jury could conclude that the Defendant sold and delivered cocaine to the CI and therefore is sufficient to sustain his convictions.  The Defendant is not entitled to relief.

## B. Sentencing

The Defendant contends that the trial court erred when it denied his request for an alternative sentence.  He asserts that he was eligible for an alternative sentence and that less restrictive measures than confinement had been successfully used with him in the past.  The State counters that the Defendant has waived this argument by failing to argue it or cite authority.  It further contends that, even if not waived, the argument is without merit.

At the sentencing hearing, the parties presented the following evidence:  Detective Sapp testified that the CI completed four drug purchases from the Defendant, but the State only proceeded on two of the four sales.  The other two sales occurred on January 11, and January 14, 2019.  They occurred in the same manner and were for the same quantity of cocaine for the same price.  Both additional transactions occurred at the Defendant's apartment where he lived with his wife and a small male child.  The Defendant's wife was present for some of the transactions, and in one of the transactions, the small male child answered the apartment door when the CI knocked to purchase cocaine.  The child told the Defendant's wife that the CI was there, and the Defendant's wife came to the door and told the CI to sit on the chair in the breezeway until the Defendant arrived.

---

[2]We note that the record evinces that the State attempted to secure the testimony of the CI, but the CI had moved out of state and changed his telephone number, which impeded the State's attempts.

Matt Brown, who worked for a grant-funded organization whose efforts were primarily focused on rehabilitation, testified that he met the Defendant at the Rutherford County Jail a few months before the sentencing hearing. He assessed him for rehabilitation and, because the Defendant was not incarcerated on multiple violations or any violent offenses, he connected him with Memphis Recovery Centers, a ninety-day treatment facility in Memphis. Mr. Brown described the treatment program and its structure and said that the Defendant had been accepted into the program.

During cross-examination, Mr. Brown testified that the Defendant told him that he had been using cocaine for many years intermittently and that it had been an issue for him. Mr. Brown conceded that the Defendant did not tell him that he had ten prior felony convictions.

The Defendant's wife of thirty-plus years, Wanda Malone, testified that they shared one seventeen-year-old child. She was employed as a line server for City schools, and, because she did not drive, she relied upon the Defendant to take her to and from work. The Defendant's income came from Social Security. Ms. Malone asked for the Defendant to be given Community Corrections because she needed his help with transportation and for other matters, and their son also needed him.

During cross-examination, Ms. Malone testified that she and the Defendant were married when he was sentenced for cocaine in 1994 and receiving stolen property in 1987. Ms. Malone said that she knew that the Defendant was selling cocaine but denied knowing that he was selling it from their apartment. She also said that, when she answered the door, she did not know that the Defendant was selling cocaine to the CI. She said he had not used cocaine since the 1980s but still sold it. Ms. Malone testified about the Defendant's work history.

The Defendant then offered an unsworn allocution. The Defendant noted that he had not "been in anything over 30 something years." He had tried to "go straight" for his family. He noted that he had been charged with other offenses but that the charges had been dismissed. He asked to go back with his family, noting that he was in his sixties and did not know how much time he had left. He said that he did not hurt anyone and that he wanted to go back and provide for his wife. The Defendant expressed his desire to do things the right way.

The Defendant said that his wife had helped him and that he had not been to jail since the two were together. He assured the court that if the court were to order an alternative sentence, the Defendant would not recidivate.

The trial court noted that the Defendant had been convicted in 1994 of two counts of sale of cocaine under .5 grams.

The State then informed the trial court that it had filed a notice of sentencing as a Career Offender, listing eight prior felony convictions and one more from Federal Court. The Defendant had four burglary convictions from 1980-1983, all C felony convictions, and two more drug sale convictions in 1994, both C felonies. In 2001, the Defendant was convicted of another drug sale conviction, a C felony. The Defendant had seven total prior C felony convictions, qualifying him as a Career Offender and subjecting him to enhancement based upon having more felony convictions than necessary to establish his range.

Based upon this evidence and the arguments of parties, the trial court considered the statutory considerations and found that the Defendant was a career offender. The trial court noted that the Defendant had a previous history of criminal convictions in addition to those necessary to establish his range. The trial court further noted that the Defendant had convictions for simple possession and minor traffic offenses. The court further noted that, while forty-two years ago, the Defendant had been charged with felony escape from Davidson County, but the charge was later amended to a misdemeanor. The court further noted that drug sales have the potential to cause serious bodily injury. The trial court found that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood, making consecutive sentences appropriate.

About an alternative sentence, the court found:

> The Court has considered the following. The presentence report, the Defendant's mental and physical condition and social history. As to his mental condition, the presentence report indicates that there is no issues or history of mental illness or . . . that he suffers from any issue of mental health. Appears to be a healthy individual from a physical standpoint as well.

> As to his social history, he is married. His wife testified today. They have been married for 20 years or so. They have a child together.

> Again, the court has already discussed his employment history. And to call it a history is a gross compliment to [the Defendant]. Part of his history dating back to the mid '90's is that of an individual that sells cocaine within the confines of Rutherford County.

> The next factor, the facts and circumstances surrounding the offense, and the nature and circumstances of the criminal conduct involved. Facts and circumstances surrounding the offense are what appear to the Court as a very professional transaction. This wasn't a happenstance of a drug transaction, either offense. January 2nd or January 4th.

This was like going through the McDonald drive-through, but probably a little bit more efficient. [The Defendant] knew why the gentleman was there. The gentleman knew what to do. This wasn't . . . the first time. It was very evident to the Court.

The nature and circumstances of the criminal conduct involved. It's less than .5 grams, which if you were to put less than .5 grams of powdery substance on the table, it would not appear to be a lot. But given the fact that we had a repeated sale, four times within one month – I realize he was only convicted of two. But there's testimony of the other two offenses. These are offenses that contribute to the drug epidemic in this County, in this State.

The next factor, the prior criminal history of the Defendant. The Court has already found that he's a Career Offender. That certainly does not favor [the Defendant] as to alternative sentencing. And, again, the State is correct in pointing out that several of the convictions were for the exact same offense that we're here today.

The previous actions and character of the Defendant. The previous actions and character of the Defendant that jump out to the court relate to his prior attempts to seek treatment. This case has been pending for – since the November, 2019 Grand Jury. I don't know off the top of my head when [the Defendant] was served. Looks like he was served in November 2019.

So, this case has been pending for three years. And during those three years, up until a jury found [the Defendant] to be guilty, there has been no proof of any efforts to seek treatment prior to his arrival at the Sheriff's Office following the conviction.

However, the Court does credit him for at least seeking that out. Sometimes people have to hit rock bottom before they'll do that.

The next factor, whether or not the Defendant might reasonably be expected to be rehabilitated, and the Defendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation the Defendant will commit another crime.

[The Defendant's attorney] is correct in pointing out that during the pendency of this case, [the Defendant] has abstained from criminal conduct or, at least at a minimum, there's been no proof that he has not abstained.

However, looking back at the sentences associated with the prior convictions in this case, it appears to the Court back in the '80's and '90's

10

that . . . it seemed like probation just wasn't an option. He's served a lot of these sentences. And I suppose that changed in 1989.

Nevertheless, based upon the fact that [the Defendant] has a very extensive criminal history, he lacks the potential for rehabilitation based upon the prior sentences that he has served. Obviously, the Department of Corrections was not successful in correcting [the Defendant] while he was incarcerated, or in some sense it was not a penalty that initiated change in [the Defendant's] life.

Also, the testimony of Ms. Malone was that he was not using cocaine in 2019 . . . . The Court finds that to be a very interesting statement. So, he wasn't using at the time of the selling, so he didn't have a problem selling it to those that did have a problem.

. . . .

But as it relates to the Memphis Recovery Center, a 90-day program . . . is insufficient for a 30 or 40 year history of using cocaine. It's going to take a lot more than 90 days for someone with that issue. There's not been any proof associated with how long it takes for someone to recover from cocaine addiction, and I'm not making a judicial finding associated with that. But I think that one is a no-brainer.

So, the Court finds that he has a lack of potential for rehabilitation. . . .

The next factor, whether or not it reasonably appears that the Defendant will abide by the terms of probation. I think that very much relates to the previous factor. And the Court would incorporate its findings on that factor with this factor.

The next factor, whether or not the interests of society in being protected from possible future criminal conduct of the Defendant are great. The Court has not heard direct proof about the interests of society in this case. But the Legislature has certainly made a policy decision about the criminal conduct involved with selling a Schedule II controlled substance. Very serious offense.

They have set out a program, Community Corrections, for nonviolent drug offenses. And the Court agrees with [the Defendant's attorney that the Defendant] is statutorily eligible for that program. The question is, is he a good candidate.

11

But the Court does find that the interest of society . . . in not having people sell highly addictive substances that could result in the death of another, cocaine from being sold in this community. I challenge anybody to say otherwise.

The next factor, whether or not measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the Defendant. Again, the Court has made comment about the sentences associated with these prior convictions dating back to the '80's and '90's, and even in 2001.

It appears that a conviction from September of 2002, Rutherford County Circuit Court to sale of cocaine . . . he was placed on three years of probation. I don't see where he was ever ordered to serve that. . . . .

. . . .

[A]s it at least relates to the 2001 conviction, it appears to the Court that he successfully completed probation. That favors [the Defendant].

The next factor, whether or not a sentence of full probation would unduly depreciate the seriousness of the offense. Again, this is – the seriousness of the offense in and of itself, two sales of cocaine in a very professional manner not 2 miles from this court house – and ironically – the Court is not considering this at all. . . .

And in one instance – not before the Court, but these other two sales that Detective Sapp testified to today where there was a minor child involved, I suppose we can quibble over how old the child was. But he was certainly a minor. The Court recognizes those are not the offenses before it today. But the Court finds that a sentence of full probation for the professional sale of cocaine within Rutherford County by a Career Offender would unduly depreciate the seriousness of the offense[s].

The trial court went on to find that confinement was particularly suited for the Defendant, given the length of time that he had sold cocaine and that incarceration was particularly suited to provide an effective deterrent to others likely to commit this offense or similar offenses of selling drugs in the county. The court ordered that the sentences run concurrently, it denied the Defendant's request for Community Corrections, and it sentenced him to fifteen years of incarceration.

12

The State first contends that the Defendant waived this issue by failing to adequately brief it. Under Tennessee Court of Criminal Appeals Rule 10(b), this court treats as waived any issues not supported by argument, citation to authorities, or appropriate references to the record. Further, it is the duty of the appellant to prepare a transcript "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). While the brief lacks strong argument, it does contain citations to authorities and citations to the record. Therefore, we deem it adequate, and we turn to address the issue on its merits.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. The defendant bears "[t]he burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Defendant does not contest the length of his sentence, but only the trial court's denial of Community Corrections. We conclude that the trial court properly sentenced the Defendant.

13

As previously stated, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012). We also reiterate that the defendant bears "the burden of showing that the sentence is improper." *Ashby*, 823 S.W.2d at 169. A trial court's decision regarding probation will only be invalidated if the court "wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014). Under an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.* at 475.

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *Ashby*, 823 S.W.2d at 168 (quoting State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). A defendant who is sentenced as an especially mitigated or standard offender and who has committed a Class C, D, or E felony should be "considered as a favorable candidate for alternative sentencing options," if certain conditions are met. T.C.A. § 40-35-102(6)(A). The guidelines regarding favorable candidates are advisory. T.C.A. § 40-35-102(6)(D). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

14

Initially, we note that the Defendant is not a favorable candidate for alternative sentencing pursuant to Tennessee Code Annotated section 40-35-102(6)(A). Furthermore, after much thoughtful consideration, the trial court denied the Defendant's request for alternative sentencing based on his long history of criminal convictions and the necessity of protecting society by preventing the Defendant from selling drugs in the community. The trial court also found that an alternative sentence would unduly depreciate the seriousness of the offenses. Lastly, the trial court found that the fact that the Defendant had successfully completed probation on a prior occasion weighed in his favor, but was outweighed by the other considerations. After considering all of the relevant factors, the trial court deemed the factors weighed against the Defendant's request for Community Corrections.

The evidence presented at the sentencing hearing established that the Defendant had multiple prior felony drug convictions and seven total prior felony convictions. He also had two untried charges for the sale of cocaine. The evidence was that the Defendant sold these drugs out of his home in a professional manner, did not have other stable employment for the duration of his lifetime, and never accepted responsibility for these drug sales. Based on this evidence, we conclude that the Defendant has not established that the trial court abused its discretion by denying him an alternative sentence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE